UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| JOHN DUSTIN LAUING, BERNARD LAUING, EUGENIE LAUING, <br><br> Plaintiffs, <br><br> vs. <br><br> RAPID CITY, PIERRE AND EASTERN RAILROAD, INC., A SUBSIDIARY OF GENESEE & WYOMING, INC., A CONNECTICUT CORPORATION; <br><br> Defendant. | 3:19-CV-03006-RAL <br><br><br> OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE PLAINTIFFS' EXPERT |

Plaintiffs John Dustin Lauing, Bernard Lauing, and Eugenie Lauing sued Rapid City, Pierre, and Eastern Railroad, Inc. (RCPE), over a fire that spread over several hundred acres of their land. The Lauings allege that a passing RCPE train started the fire in RCPE's right-of-way and that the fire then spread to their abutting property. They claim that RCPE was negligent in operating and maintaining its train and by failing to keep its right-of-way reasonably free of combustible material. RCPE moved for summary judgment, arguing that the Lauings lack evidence that it was negligent and that their claims fail without expert testimony that its train caused the fire. This Court denies RCPE's motion for summary judgment because there are genuine disputes of material fact on whether RCPE was negligent and the facts are simple enough that a lay person would not need an expert's help to decide whether RCPE's train caused the fire.

**I.     Facts**

1

Darrell Peterman and his wife Elaine were hunting rattlesnakes south of Blunt, South Dakota on the afternoon of August 25, 2018. Doc. 45-1 at 2–3; Doc. 45-2 at 2. Two individuals familiar with the area led the Petermans to a pasture where they could find some snakes. Doc. 58-2 at 2–3; Doc. 58-1 at 3. Southwest of the Petermans' location was a railroad track owned by RCPE. Doc. 45-1 at 4. The Petermans were parked on a hill located about a half mile to a mile from the tracks when Elaine saw a train approaching from the south. Doc. 45-1 at 5; Doc. 45-2 at 2; Doc. 58-1 at 10. As the train passed the Petermans, Elaine saw smoke appear on the far side of the tracks near the back of the train, followed momentarily by flames. Doc. 45-2 at 3–6; Doc. 58-1 at 6, 10; Doc. 45-1 at 5–6; Doc. 58-2 at 6–7. Darrell testified that the smoke was coming from a point close to the tracks and that the flames spread quickly from there. Doc. 45-1 at 7; Doc. 58-2 at 6–7. One of the men who had led the Petermans to the pasture called the Blunt Fire Department. Doc. 45-1 at 8.

The Petermans testified that before the train arrived, they did not see any vehicles or people in the area of the fire, although Elaine acknowledged that they hadn't been parked on the hill long and that she did not know who may have been through the area before they arrived. Doc. 45-1 at 10; Doc. 45-2 at 6–7; Doc. 58-1 at 11–12. Darrell remembered a strong wind blowing from the southeast but said that it was otherwise a nice day with clear skies. Doc. 45-1 at 7, 10–12. He also remembered that the "engine was working, you know, trying to gain speed" as the train passed them, Doc. 45-1 at 7, but said that he did not see any smoke or sparks coming from the train or anything hanging down from the train that could have caused a spark, Doc. 58-2 at 6–8. Other than testifying to seeing smoke on the far side of the tracks as the train passed and then seeing flames, Elaine said that she did not know how the fire started and that she did not see anything come off the train or any smoke on the locomotive or railcars. Doc. 58-1 at 6, 9.

Upon learning of the fire, Bernard and Eugenie Lauing went to their pasture and moved their cattle away from the flames. Doc. 63 at ¶ 8; Doc. 62-3 at 2; Doc. 64 at ¶ 8. The Blunt Fire Department arrived around two in the afternoon. Doc. 45-3 at 2–3. It took five hours, forty people, and twenty-one firefighting apparatuses to fully contain the fire. Doc. 45-3 at 3. Blunt Fire Chief Travis Heuertz testified that the fire started "right along the tracks within that hundred foot or so of the [railroad] bridge." Doc. 45-3 at 2. Heuertz determined this was so because the wind was blowing out of the "east-southeast" at about 25 miles per hour and thus would not have allowed the fire to back burn "much if at all." Doc. 45-3 at 2. When asked if he could determine whether the fire started on RCPE's right-of-way, Heuertz testified that the fire "probably" started "within 20 to 30 feet of the tracks." Doc. 45-3 at 2. He further explained that the "railroad tracks probably had the best fuel there was in the right-of-way," and that the fuel pattern supported his determination that the fire started within twenty to thirty feet of the tracks. Doc. 45-3 at 2. Heuertz also testified that aerial photographs showing RCPE's right-of-way and the portion of the Lauing ranch that was burned by the fire suggested that the right-of-way may have had more abundant vegetation than the Lauings' pasture. Doc. 45-3 at 4–5; Doc. 45-13 at 4. Heuertz acknowledged, however, that he did not know what caused the fire to ignite and that he was unaware of anything that RCPE did negligently to cause the fire. Doc. 39 at ¶¶ 4–5; Doc. 44 at ¶¶ 4–5; Doc. 58-4 at 6–8.

According to an affidavit from John Dustin Lauing, RCPE's right-of-way in the area Heuertz believes the fire started measures about 97 feet from the edge of the ballast rock to the fence line. Doc. 46 at ¶¶ 7–8. John Dustin testified that a few days after the fire, he observed tall vegetation, broken railroad ties, and spray paint cans in RCPE's right-of-way. Doc. 45-4 at 2. The railroad ties were still smoldering. Doc. 45-4 at 2. Bernard Lauing testified that RCPE did not do

anything to control the vegetation. Doc. 45-5 at 2. The Lauings cite to pictures of RCPE's right-of-way to support their claim that it contained combustible materials. Doc. 43; Doc. 45-16.

The Blunt Fire Department sent RCPE an invoice for the costs of fighting the fire because it believed that the fire started on RCPE's right-of-way. Doc. 45-3 at 6–7. RCPE did not pay the invoice. Doc. 45-3 at 7.

Daniel Dalton, RCPE's general manager, learned of the fire a few days after it occurred. Doc. 45-8 at 2. Dalton ordered an inspection of the inductor tubes and carbon traps on the locomotives for cleanliness and carbon build up. Doc. 45-8 at 3. Mike Harms, a locomotive mechanic for RCPE, examined the locomotives in Rapid City. Doc. 58-6 at 2, Doc. 45-9 at 3. Harms did not know how the locomotives arrived in Rapid City from Huron nor how long after the fire his inspection occurred. Doc. 45-9 at 2–3. He testified that the exhaust stacks "looked good," that the carbon buildup on the inductor tube was not "anything more than normal," and that his inspection indicated that the locomotives did not cause the fire. Doc. 58-6 at 4, 8–9. Harms did not create a written report of his inspection and did not examine anything on the locomotives beyond the exhaust stacks and inductor tubes. Doc. 45-9 at 3. Workload reports from RCPE show that one of the locomotives required repairs in May 2018 for a defect that caused a "large cable" to burn, and the other locomotive required repairs in July 2018 for a defect that caused a coil to burn. Doc. 45-8 at 6–7; Doc. 45-14.

Dalton wanted the railcars on the train inspected but believes that some of them were not inspected because of problems locating them. Doc. 45-8 at 3, 7. He also reviewed the rear-facing camera from the train but did not see anything noteworthy. Doc. 58-3 at 2. His investigation of the fire thus consisted of viewing the rear-facing camera footage, having the inductor tubes and carbon traps examined, and having the railcars RCPE could find inspected. Doc. 45-8 at 4. Dalton

believed that his investigation was sufficient to rule out RCPE's train as the cause of the fire. Doc. 45-8 at 5.

The Lauings' expert rebuttal witness Brandon Ogden disagreed, opining that RCPE's investigation was too cursory and untimely to be able to conclude that its train did not start the fire. Doc. 48-10 at 5–10; Doc. 45-11 at 2. Ogden explained that locomotive and rail car inspections should occur immediately after a fire because evidence can become difficult to detect even a few days later. Doc. 48-10 at 8; Doc. 45-11 at 3. In Ogden's view, RCPE's "failed inspection and investigation protocol" meant that "many common railroad causes of sparks that can ignite a fire cannot be ruled out as a potential cause." Doc. 48-10 at 8. Ogden also opined that RCPE failed to reasonably maintain its right-of-way. Doc. 48-10 at 9.

The Lauings sued RCPE, claiming it was negligent by, among other things, failing to properly operate, maintain, control, and monitor its train and equipment and failing to keep its right-of-way reasonably free of combustible matter. Doc. 1 at ¶ 13. RCPE moved for summary judgment, arguing that the Lauings lack evidence that it was negligent and that their claims fail without expert testimony that it caused the fire. Docs. 36, 37. RCPE also moved to exclude Ogden as an expert witness. Doc. 40.

## II.     Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish

that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B).  A party opposing a properly supported motion for summary judgment "may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor, without resort to speculation, conjecture, or fantasy." Reed v. City of St. Charles, 561 F.3d 788, 790–91 (8th Cir. 2009) (cleaned up and citations omitted).  In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).

## III.   Analysis

The Lauings, who are South Dakota residents, sued RCPE in federal court based on diversity jurisdiction.  RCPE admitted in its answer that it is headquartered in Rapid City, South Dakota, and that it is a Delaware corporation.  Doc. 4 at 1.  As one of its affirmative defenses, RCPE alleged that this Court lacked subject matter jurisdiction because the parties were not completely diverse.  Doc. 4 at 2.  RCPE did not argue that this Court lacked jurisdiction in any of its other filings and never moved to dismiss.

Federal diversity jurisdiction requires complete diversity of citizenship among the parties. OnePoint Solutions, LLC v. Borchert, 486 F.3d 342, 346 (8th Cir. 2007).  "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." Id.  Under the diversity statute, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state

where it has its principal place of business." 28 U.S.C. § 1332(c)(1). The Supreme Court interpreted the phrase "principal place of business" as "referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities," that is, the corporation's "'nerve center.'" Hertz Corp. v. Friend, 559 U.S. 77, 92–93 (2010). A corporation's nerve center "should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination." Id. at 93.

Because the record did not contain any information about whether Rapid City is the "nerve center" of RCPE, this Court directed RCPE to either move to dismiss for lack of complete diversity of citizenship or to file a statement withdrawing its affirmative defense and acknowledging that RCPE's "never center" is not within South Dakota. RCPE has now filed a statement withdrawing its defense that subject matter jurisdiction is lacking and explaining that it is not asserting that RCPE's nerve center is within South Dakota. Doc. 66.

Since the parties are completely diverse and the fire occurred in South Dakota, South Dakota law governs the Lauings' negligence claims. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 72–73 (1938). To succeed on their negligence claims, the Lauings must show that RCPE owed them a duty, that RCPE breached that duty, and that this breach was the proximate and factual cause of their injury. Hanson v. Big Stone Therapies, Inc., 916 N.W.2d 151, 158 (S.D. 2018); Kirlin v. Halverson, 758 N.W.2d 436, 448 (S.D. 2008). Again, the Lauings make two negligence claims: that RCPE negligently operated and maintained its train and negligently failed to keep its right-of-way reasonably clear of combustible materials. This Court analyzes the question of duty for these claims together but then considers the claims separately when analyzing breach and causation.

**A. Duties RCPE Owed the Lauings**

The existence of a duty is a question of law for the court. Smith ex rel. Ross v. Lagow Const. & Developing Co., 642 N.W.2d 187, 192 (S.D. 2002). The Lauings claim that RCPE owed them a general duty of reasonable care, and that two context-specific manifestations of this duty apply here. See SDCL 20-9-1 ("Every person is responsible for injury to the person, property, or rights of another caused by his willful acts or caused by his want of ordinary care or skill . . . ."). First, the Lauings assert that RCPE owes a "duty to exercise ordinary and reasonable care and prudence in the operation of its railway" and that it "must exercise reasonable care to avoid danger to the public, including the property of others near its track." Doc. 43 at 8 (quoting 65 Am. Jur. 2d Railroads § 197 (Feb. 2022 Update) (footnote omitted)). Second, the Lauings assert that RCPE owes a duty to "use ordinary or reasonable care and diligence to keep its track and right of way or other contiguous property reasonably free from combustible matter," and that a railroad "is liable for damage caused by fire as a result of a breach of this duty." Doc. 43 at 8 (quoting 74 C.J.S. Railroads § 833 (Mar. 2022 Update)).

### 1. Preemption

The duties the Lauings argued in their brief are the same duties they alleged in their complaint. Doc. 1 at ¶¶ 12–13. RCPE did not argue that federal law preempts these duties in its initial brief. Doc. 37. In its reply brief, however, RCPE makes a one-sentence argument in a footnote that the federal Locomotive Inspection Act (LIA) preempts the state standard of care to the extent that the Lauings claim this standard applies to maintenance of its locomotives and railcars. Doc. 55 at 7 n.3. A preemption defense based on the LIA can be waived, Little v. Budd Co., 955 F.3d 816, 821–23 (10th Cir. 2020), and both this Court and the Eighth Circuit usually decline to address arguments raised for the first time in a reply brief, see Select Specialty Hosp.-Sioux Falls, Inc. v. Brentwood Hutterian, Brethren, Inc., 4:19-CV-04171-KES, 2021 WL 6125814,

at *11 (D.S.D. Dec. 28, 2021) (declining to consider cursory argument raised for the first time in a reply brief); Liscomb v. Boyce, 954 F.3d 1151, 1154 (8th Cir. 2020) (holding that claims not raised in opening appellate brief are waived).   This Court will not consider RCPE's LIA preemption argument since RCPE raised it for the first time in its reply brief and even then, only in a cursory fashion.[1]

RCPE also argues that 49 C.F.R. § 213.37 preempts a state standard of care from applying to at least some portion of its right-of-way.   Section 213.37 addresses vegetation "on or immediately adjacent to roadbed," id., and courts have held that it preempts state negligence claims concerning vegetation in this area, Easterwood v. CSX Transp., Inc., 933 F.2d 1548, 1554 (11th Cir. 1991); S. Pac. Transp. Co. v. Builders Transp., Inc., No. 90-3177, 1993 WL 185620, at *6 (E.D. La. May 25, 1993).   Unlike the LIA preemption argument, RCPE devotes more than one sentence to its claim about preemption under § 213.37.   Doc. 55 at 16–18.   Indeed, the Lauings address § 213.37 themselves in their response to RCPE's motion for summary judgment.   Doc. 43 at 15–16.   They acknowledge that § 213.37 preempts claims concerning vegetation on or immediately adjacent to RCPE's roadbed yet point out that state negligence law still applies to vegetation beyond this area but within RCPE's right-of-way.   Doc. 43 at 15–16; see Easterwood, 933 F.2d at 1554 (holding that § 213.37 did not preempt state negligence claim for "the vegetation near, but not immediately adjacent to, the tracks"); S. Pac. Transp. Co., 1993 WL 185620, at *6 (concluding that § 213.37 does not preempt a state law negligence claim concerning vegetation in

---

[1]Even if this Court were to consider RCPE's argument, the LIA would not preempt a state standard of care concerning how RCPE operated its train.  See Bates v. Mo. & N. Ark. R.R. Co., 548 F.3d 634, 638 (8th Cir. 2008) (holding that the LIA did not apply to the plaintiff's claim that a railroad's employees failed to operate its train with the necessary care).  Nor would the LIA preclude a state law claim brought to redress RCPE's violation of the standard of care set forth in the LIA itself. Ward v. Soo Line R.R., 901 F.3d 868, 871, 874 (7th Cir. 2018).

the railroad's right of way but not on or immediately adjacent to roadbed); <u>see also</u> <u>Mo. Pac. R.R.</u> <u>v. R.R. Comm'n of Tex.</u>, 833 F.2d 570, 577 (5th Cir. 1987) (explaining that "not all right-of-way property lies 'immediately adjacent to the roadbed,'" and that § 213.37 does not apply to "vegetation that is on the right of way but not immediately adjacent to the roadbed"). This Court therefore interprets the Lauings' claim about RCPE's right-of-way as only applying to the area not covered by § 213.37. Having dealt with RCPE's preemption arguments, this Court turns to the duties RCPE owed the Lauings.

### 2. Duties Owed

Since federal law does not preempt the Lauings' claims, state law supplies RCPE's standard of care. <u>Boomsma v. Dakota, Minn. & E. R.R. Corp.</u>, 651 N.W.2d 238, 242–44 (S.D. 2002) (looking to state statutes and common law to determine railroad's duty after finding that federal law did not preempt the plaintiffs' claims), <u>overruled on other grounds by</u> <u>State v. Martin</u>, 683 N.W.2d 399 (S.D. 2004). Under South Dakota law, RCPE owed the Lauings a duty to exercise ordinary care in operating and maintaining its train and maintaining its right of way. <u>Id.</u> at 244 (concluding that the defendant railroad "owes an ordinary duty of care to the public"); <u>Cronk v.</u> <u>Chicago, M. & St. P. Ry. Co.</u>, 52 N.W. 420, 421–23 (S.D. 1892) (recognizing that a railroad company owed a duty of ordinary care to a landowner whose property was burned by a fire started by the railroad's train); <u>Kelsey v. Chi. & N.W. Ry. Co.</u>, 45 N.W. 204, 208 (S.D. 1890); <u>see also</u> <u>Kiemele v. Soo Line R.R. Co.</u>, 93 F.3d 472, 474–75 (8th Cir. 1996) (concluding that a railroad owed a plaintiff injured at a railroad crossing a "general duty to exercise reasonable care under the circumstances"). This general duty includes a duty for RCPE to keep its right-of-way reasonably free of combustible material. <u>Kelsey</u>, 45 N.W. at 208 (concluding that the accumulation of dry grass or other combustible material in the railroad's right-of-way was evidence of negligence);

Kansas City S. Ry. Co. v Beaty, 388 S.W.2d 79, 83 (Ark. 1965) (recognizing that railroad owes a duty of due care to keep its right-of-way free of combustible materials); 74 C.J.S. Railroads § 833 (Mar. 2022 Update).

### B. Claim that RCPE Failed to Exercise Ordinary Care in Operating and Maintaining its Train

RCPE argues that the Lauings' claim concerning the operation and maintenance of its train fails because they do not have an expert to testify that RCPE's train caused the fire and because they lack any evidence that RCPE breached a duty.   The Lauings disagree, arguing that circumstantial evidence shows that RCPE's train caused the fire and that they can show breach of duty under either a presumption of negligence recognized in South Dakota or the doctrine of res ipsa loquitor.  Because RCPE's train must have started the fire for the presumption and res ipsa loquitor to apply, this Court considers RCPE's argument on causation first.

### 1. Causation and Need for Expert Testimony on Whether RCPE's Train Started the Fire

The Lauings argue that circumstantial evidence shows that RCPE's train started the fire. Plaintiffs relying on circumstantial evidence to show causation must prove their theory of causation by a preponderance of the evidence.  Parham v. Dell Rapids Twp., 122 N.W.2d 548, 552 (S.D. 1963).  This standard does not require plaintiffs to eliminate "all other possible explanations of causation that the ingenuity of counsel might suggest."  Crandell v. Larkin & Jones Appliance Co., 334 N.W.2d 31, 34 (S.D. 1983) (citation omitted).  The record here, viewed in the light most favorable to the Lauings as this Court must in ruling on the pending summary judgment motion, would allow a reasonable juror to find it more likely than not that RCPE's train started the fire. After all:

- The Petermans from a hillside watched as RCPE's train passed, seeing smoke and then flames near the tracks where RCPE's train had just passed. Doc. 45-2 at 3–6; Doc. 58-1 at 6, 10; Doc. 45-1 at 5–7; Doc. 58-2 at 6–7.

- Based on the fuel pattern and the direction of the wind, Fire Chief Heuertz believes that the fire started within twenty to thirty feet of RCPE's tracks. Doc. 45-3 at 2. Heuertz also testified that the right-of-way "probably had the best fuel there was" for the fire. Doc. 45-3 at 2.

- The Petermans did not see any people or vehicles in the area of the fire before RCPE's train arrived, and it was a nice, clear day. Doc. 45-1 at 10–12; Doc. 45-2 at 6–7; Doc. 58-1 at 11–12.

- The crew on the train testified that they did not see any smoke or flames as they passed through the area, Elaine Peterman testified that she did not see any smoke until after the train had started passing, and there is no evidence of there being a fire before the train arrived. Doc. 45-10 at 5; Doc. 45-2 at 6.

The Supreme Court of South Dakota has upheld plaintiffs' verdicts based on similar facts. In Nelson v. Chicago B. & Q.R. Co., 197 N.W. 288 (S.D. 1924), for instance, witnesses saw a fire arise along the defendant's right-of-way shortly after its train passed. Id. at 289. Dry grass and weeds had accumulated on the right-of-way, and the direction of the wind suggested that the fire had started near the track and then spread to the plaintiff's property. Id. Although the defendant did not identify any other possible source for the fire, its evidence on the condition and handling of its train "tended to refute the possibility" that the train had started the fire. Id. The Supreme Court of South Dakota held that these facts justified the trial court's refusal to direct a verdict for the defendant on the question of causation. Id. at 289–90. The court reached a similar conclusion in Kelsey, holding that "purely circumstantial" evidence that a fire started near the tracks about ten minutes after the defendant's train passed supported a finding that "the fire originated from the sparks or fire of the passing train." 45 N.W. at 206. This was so even though there was no evidence that the locomotive engine was emitting sparks, hot coals, or cinders when it passed. Id.

RCPE argues that the Lauings' circumstantial evidence is insufficient because there are several "plausible" sources for the fire apart from its train. RCPE first posits that an electric fence near its railroad bridge could have started the fire. RCPE submitted a picture of the fence and an affidavit from one of its employees stating that he saw charred ground leading up to the fence and that this indicated to him "that the fence could have been a possible ignition source for the fire." Doc. 57 at ¶ 7; Doc. 57-1. According to an affidavit from the Lauings, however, the electric fence shown in RCPE's picture was not operational and had no power to it since 2015. Doc. 63 at ¶¶ 4–7. The Lauings also aver that the charred ground near the electric fence shown in RCPE's picture did not actually burn until later in the evening on August 25. Doc. 63 at ¶ 9; Doc. 64 at ¶ 9. They explain that after learning of the fire they went to the area shown in the picture to move their cattle and that when they left the pasture that day this area had yet to burn. Doc. 63 at ¶¶ 8–9; Doc. 64 at ¶¶ 8–9.

RCPE next claims that the people and the vehicles in the area that day could have started the fire. According to RCPE, Elaine testified that "there were two individuals on foot who she thought were ranchers that [the Petermans] saw on the date of the fire." Doc. 55 at 3. Other portions of Elaine's deposition make clear, though, that the ranchers arrived after the train passed to save their cattle from the fire. Doc. 62-1 at 2–5. And these "ranchers," of course, were Bernard and Eugenie Lauing. Doc. 63 at ¶ 8; Doc. 62-3 at 2; Doc. 64 at ¶ 8. RCPE also asserts that the Petermans and the two individuals who showed them where to find rattlesnakes could have started the fire when driving to the hunting spot. But RCPE has not pointed to any evidence that the Petermans and the other two individuals were ever driving west of the tracks where the Petermans saw the fire start. Indeed, the Petermans were parked on a hill located about a half mile to a mile east of the tracks when the train arrived and the fire appeared to start. Doc. 62-2 at 2–5; Doc. 58-

1 at 10.  RCPE's other hypothesis is that "it is very plausible that the passing train simply fanned a fire that was already smoldering."  Doc. 55 at 10.  RCPE does not cite any evidence to support this claim, and the record does not provide any either.  As explained above, the Petermans did not see any people or vehicles in the area of the fire before the train arrived, RCPE's crew testified that they did not see any smoke or flames as they passed through the area, and Elaine did not see any smoke until after the train had started passing them.

RCPE's last argument on causation is that the fire could have started off its right-of-way and burned back towards the track.  As support RCPE cites to Heuertz's testimony that "there's no way to tell on how much back burn you had."  Doc. 58-4 at 5.  RCPE takes this statement out of context.  Heuertz was asked whether charred ground at the edge of RCPE's ballast rock could indicate back burn.  Doc. 58-4 at 5.  He replied: "Yeah, it - - there's - - there's no way to tell on how much back burn you had.  Since you had the - - rock there, it could have burned back 10 feet to it, or it could have started right at the edge of the rock."  Doc. 58-4 at 5.  Heuertz did not change his opinion that, based on the wind and fuel pattern, the fire started within twenty to thirty feet of the tracks.  Doc. 45-3 at 2.  RCPE also claims that Elaine Peterman testified that "there was a backdraft and the fire seemed to come back towards the track."  Doc. 55 at 3.  But Elaine's testimony does not support RCPE's theory that the fire started off its right-of-way and then spread back towards the tracks.  Again, both Elaine and Darrell Peterman testified that the fire broke out near the tracks.  Elaine only mentioned a backdraft when describing how the fire progressed from when she first saw the smoke: "It just went up the hill, you know, up the hill and around, and it was going in through the gullies and stuff.  You could see the smoke, but a lot of times there was a backdraft or something and it seemed to come back, you know, and stuff."  Doc. 58-1 at 5.

In sum, a reasonable jury could easily find that RCPE's train was more likely to have caused the fire than any of the ignition sources posited by RCPE. The explanations for the fire offered by the parties are not equally plausible, and the Lauings under South Dakota law need not negate all possibilities that something other than RCPE's train caused the fire to survive summary judgment. Crandell, 334 N.W.2d at 34; Garrido v. Team Auto Sales, Inc., 913 N.W.2d 95, 100 (S.D. 2018) (recognizing that circumstantial evidence can create an inference of causation "even though it does not negate the existence of remote possibilities that the injury was not caused by the defendant" (cleaned up and citation omitted)).

This leaves RCPE's argument that the Lauings need an expert to testify that the train caused the fire. Federal courts sitting in diversity jurisdiction look to state law to determine whether expert testimony is necessary. Pro Serv. Auto., LLC v. Lenan Corp., 469 F.3d 1210, 1213–14 (8th Cir. 2006). South Dakota law requires expert testimony "when the subject matter at issue does not fall within the common experience and capability of a lay person to judge." Sheard v. Hattum, 965 N.W.2d 134, 143 (S.D. 2021). Expert testimony was necessary, for instance, to show that a manufacturer's failure to test a piece of exercise equipment proximately caused the plaintiff's injury. Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 408 (S.D. 2007). Expert testimony was also necessary to show causation where the plaintiff had preexisting injuries to his neck, head, shoulders, and legs, and claimed that a car accident caused extensive damage to these same body parts. Cooper v. Brownell, 923 N.W.2d 821, 824–25 (S.D. 2019) (per curiam). In contrast, expert testimony was not required to show that a physical therapist caused a plaintiff recovering from hip surgery to fracture her femur where evidence supported the plaintiff's claim that she was not injured before her physical therapy session and the plaintiff alleged that she suffered a marked increase in pain and worsening of her ambulation immediately after the physical

therapist's alleged negligent act. <u>Hanson</u>, 916 N.W.2d at 159–61. As these examples illustrate, the facts of the case determine the necessity of expert testimony.

RCPE relies on four cases—none of which are from South Dakota—to argue that whether its train caused the fire is beyond the common experience and capability of a lay person. See <u>Ajala v. W.M. Barr & Co.</u>, 16-CV-2615 (VEC), 2018 WL 6322147, at *2 (S.D.N.Y. Dec. 4, 2018) (stating that expert testimony would be helpful because the question of whether "static electricity, a stove pilot light, or some other phenomenon caused" the defendant's paint-thinner product to ignite was "not easily resolved by lay persons without an expert's guidance"); <u>Howard v. Bosch Thermotechnology Corp.</u>, 4:17 CV 763 CDP, 2018 WL 2087259, at *3 (E.D. Mo. May 4, 2018) (holding that plaintiffs claiming that the defective design of a water heater caused a fire in their house needed expert testimony on causation because "of the complexities involved in linking a component failure of the water heater to the release of combustible heat levels to the surrounding environment"); <u>St. Cyr v. Flying J Inc.</u>, No. 3:06-cv-13-J-33TEM, 2008 WL 2608127, at *7 (M.D. Fla. June 29, 2008) (stating, in the context of a motion in limine, that the cause and origin of a fire that started after plaintiffs filled their van with propane at defendant's gas station was not a matter of common knowledge); <u>Presley v. Lakewood Eng'r & Mfg. Co.</u>, No. 06-5160, 2007 WL 4287583, at *6 (W.D. Ark. Dec. 4, 2007) (finding that expert testimony was necessary in case where plaintiffs alleged that a defective condition in a space heater caused a fire). These cases neither involved fires allegedly caused by a passing train nor establish a general rule that, as RCPE argues, the failure to have an expert on causation "is fatal to a fire case." Doc. 37 at 4. Rather, these decisions reaffirm that the facts of a case determine the need for expert testimony. See <u>Weber v. Paduano</u>, No. 02 Civ.3392 GEL, 2003 WL 22801777, at *9 n.6 (S.D.N.Y. Nov. 25, 2003) ("Sometimes, the question whether one agency as opposed to another caused a fire may well lie

within the experience and observation of the ordinary jurymen from which they may draw their own conclusions, and the facts may be of such a nature as to require no special knowledge or skill." (cleaned up and citation omitted)).

The facts here do not require expert testimony. Again, the Petermans did not see any people or vehicles in the area of the fire before RCPE's train appeared, and there is no evidence of there being a fire before the train arrived. Rather, the Petermans saw the fire break out near the tracks as RCPE's train passed. Simply because RCPE posits alternative ignition sources does not thereby transform this into a case where the Lauings need an expert witness on causation of the fire. Given the rather simple explanation from the eyewitnesses Elaine and Darrell Peterman, common experience and capability could permit a jury to infer that RCPE's train caused the fire.

### 2. Breach of Duty

RCPE argues that summary judgment should enter because the Lauings have no evidence that it was negligent. The Lauings disagree, arguing that because the evidence shows that RCPE's train started the fire, their claim that RCPE negligently operated and maintained its train survives summary judgment under either a presumption of negligence or the doctrine of res ipsa loquitor. As the Lauings acknowledge, though, South Dakota law is not entirely clear on whether there is a difference between the presumption of negligence in cases where locomotive engines start a fire and application of res ipsa loquitor. Doc. 43 at 15 n.9.

The Supreme Court of South Dakota adopted the presumption of negligence in Kelsey, 45 N.W. 204 (S.D. 1890), holding that proof that a locomotive engine caused a fire by emitting sparks raises a presumption that the railroad was negligent. 45 N.W. at 207. This presumption "cast[s] the burden of proof upon the [railroad] of showing that the locomotive engine was properly constructed and managed." Id. Under Kelsey, if the railroad fails to offer any rebuttal evidence,

17

the presumption entitles the plaintiff to a directed verdict.[2]  Id.  The court in Kelsey did not discuss

the res ipsa loquitor doctrine.  Nor did the court discuss the doctrine of res ipsa loquitor when

applying the rule in Kelsey for several years thereafter.  See White v. Chi., M. & St. P. Ry., 47

N.W. 146, 147 (S.D. 1890) (explaining that when the origin of the fire is "fixed" upon the railroad,

"it is presumptively chargeable with negligence, and must assume the burden of proving that it

had used all those precautions for confining sparks or cinders, so as to prevent the ignition of fire

to surrounding combustible material"); Cronk, 52 N.W. at 423 (explaining that when the fire was

shown to have been caused by sparks from the locomotive, it "devolved upon the company, in

order to avoid liability, to show that the locomotive was not in a defective condition, and was not

unskillfully or carelessly handled"); Smith v. Chi., M. & St. P. Ry., 55 N.W. 717, 718 (S.D. 1893)

(recognizing the presumption that arose because the train's engine caused the fire without

discussing res ipsa); Yankton Fire Ins. Co. v. Fremont, E. & M.V.R. Co., 64 N.W. 514, 516 (S.D.

---

[2]The rule in Kelsey is at odds with how presumptions typically work under South Dakota law.
Under statute, a presumption shifts the burden of production but not the burden of persuasion:

> In all civil actions and proceedings, unless otherwise provided for
> by statute or by this chapter, a presumption imposes on the party
> against whom it is directed the burden of going forward with
> evidence to rebut or meet the presumption, but does not shift to such
> party the burden of proof in the sense of the risk of nonpersuasion,
> which remains throughout the trial upon the party on whom it was
> originally cast.  When substantial, credible evidence has been
> introduced to rebut the presumption, it shall disappear from the
> action or proceeding, and the jury shall not be instructed thereon.

SDCL § 19-19-301; see also In re Estate of Pringle, 751 N.W.2d 277, 289–90 (S.D. 2008) (stating
that a presumption does not shift the burden of proof).  The "substantial, credible evidence"
requirement in § 19-19-301 means that a presumption may be rebutted by "evidence that if
uncontradicted would be sufficient to sustain a finding of the nonexistence of the presumed fact."
In re Estate of Dimond, 759 N.W.2d 534, 538 (S.D. 2008).  "[M]ere assertions, implausible
contentions, and frivolous avowals will not avail to defeat a presumption."  Id.

1895) (applying the presumption where there was evidence "tending to prove that a fire was caused by defendant's engine" without discussing res ipsa).

Over two decades later, however, in Le Zotte v. Lindquist, 212 N.W. 503 (S.D. 1927), the court described cases where locomotive engines start fires as an exception to how res ipsa loquitor usually operates. Le Zotte involved a claim that the defendant burned down a building through negligent use of a heating stove. Id. at 504–05. In describing how res ipsa loquitor applies to fire cases, the court explained that "the general rule is that the destruction of property by fire does not raise a presumption of negligence either in the kindling or the management of the fire. The case of fires caused by sparks emitted from locomotive engines is an exception to this rule." Id. at 505 (citation omitted).

The court discussed res ipsa loquitor and fires again in Bearry v. Brensing, 182 N.W.2d 655 (S.D. 1970), a case where the defendant allegedly caused a fire in a field by negligently driving a truck over wheat stubble. Id. The court declined to apply res ipsa loquitor, citing to Le Zotte for the rule that "with the single exception of fires caused by sparks emitted from locomotive engines, res ipsa loquitor does not apply to cases involving damage or injury by fire." Bearry, 182 N.W.2d at 656.

The court revisited this holding eight years later in Hunt v. Briggs, 267 N.W.2d 566 (S.D. 1978). The plaintiffs in Hunt sued the defendants after a fire started in a field where the defendants were operating a windrower, a baler, and a bale hauler. Id. at 567. The plaintiffs alleged that the defendants were negligent in their haying operation and were liable under the res ipsa loquitor doctrine. Id. The trial court granted summary judgment for the defendants, relying on the holding in Bearry that res ipsa loquitor only applies to fires caused by sparks from trains. Hunt, 267 N.W.2d at 567–68. The Supreme Court of South Dakota reversed, finding that Bearry wrongly

relied on Le Zotte to hold that res ipsa loquitor did not apply to fires caused by "combustion-engine powered harvest equipment." Id. at 568. As the court explained, Le Zotte was decided before power-driven equipment become common, and "[t]he present day combustion-engined tractor and combines are more closely akin to the spark-emitting locomotives than they are to [the] defective stove[ in Le Zotte]." Id.

The presumption in Kelsey appears to differ from the doctrine of res ipsa loquitor. The Supreme Court of South Dakota said that the presumption puts the burden of proof on the railroad to show that the locomotive engine "was properly constructed and managed," and that the plaintiff would recover unless the railroad offered some rebuttal evidence. Kelsey, 45 N.W. at 207; see White, 47 N.W. at 147; Cronk, 52 N.W. at 423. Res ipsa loquitor, on the other hand, does not require the defendant to submit any evidence and allows but does not require a jury to infer negligence. Midwest Oil Co. v. City of Aberdeen, 10 N.W.2d 701, 703 (S.D. 1943); Barger v. Chelpon, 243 N.W. 97, 98 (S.D. 1932). Any difference between the presumption in Kelsey and res ipsa loquitor would be relevant to properly instructing the jury. This Court need not decide which of these theories applies now, though, as the Lauings' negligence claims can survive summary judgment under both.

RCPE argues that the Kelsey presumption only applies to fires caused by sparks emitted from a locomotive engine. It points to Ogden's opinion that "[m]any *railcar* mechanical components and defects can cause sparks to ignite a fire," Doc. 48-10 at 8 (emphasis added), and argues that these "separate claims of ignition" make the presumption of negligence inapplicable. Doc. 55 at 15. RCPE also argues that the presumption does not apply because the Lauings are unable to prove that its locomotives emitted any sparks. Both arguments conflict with Kelsey, however. Again, the court in Kelsey held that "purely circumstantial" evidence that a fire started

near the tracks about ten minutes after a train passed supported the finding that sparks emitted

from the locomotive engine started the fire.  45 N.W. at 206.  The court reached this conclusion

even though there was no evidence that the locomotive engine emitted sparks, hot coals, or cinders

when it passed.  Id.  If the presumption of negligence applied on the facts in Kelsey, it can apply

on the facts here too.[3]  And while RCPE points to its own investigation of the train as evidence

that it was not negligent, this evidence is not so strong that a jury would be bound to find that

RCPE acted with reasonable care.  As explained above, the Lauings' expert Ogden opined that

RCPE may have missed potential causes of the fire because its investigation was untimely and

cursory.  Doc. 48-10 at 5–8.

The Lauings also can survive summary judgment under res ipsa loquitor when the facts

are viewed in the light most favorable to the Lauings, as this Court must do at this time.  The res

ipsa loquitor doctrine exists for cases where evidence of specific acts of negligence are unavailable;

it allows a jury to infer that the defendant was negligent in some unspecified way.  Thompson v.

Avera Queen of Peace Hosp., 827 N.W.2d 570, 575 (S.D. 2013).  This doctrine "is a rule of

necessity," should be used "sparingly," and "only when the facts and demands of justice make the

---

[3]RCPE also argues that the South Dakota cases on the presumption of negligence come from the era of steam locomotives and that the Lauings have not cited any cases applying the presumption to modern diesel locomotives. Doc. 55 at 14. District courts sitting in diversity jurisdiction "are not at liberty to disregard the binding law of the state," and cannot "substitute [their] judgment for that of" the state's highest court. J-McDaniel Const. Co. v. Mid-Continent Cas. Co., 761 F.3d 916, 919 (8th Cir. 2014). RCPE has not cited any case from the Supreme Court of South Dakota (or any other court for that matter) holding that the presumption of negligence only applies to steam locomotives. Moreover, the Supreme Court of South Dakota continued to accept the existence of such a presumption as recently as 1978 in Hunt when diesel locomotives were in use. See Hunt, 267 N.W.2d at 567–68; see also Bearry, 182 N.W.2d at 656; Geoffrey Freeman Allen, Britannica Academic Edition: Diesel traction - locomotive (2022) ("By the end of the 1960s, diesel had almost completely superseded steam as the standard railroad motive power on nonelectrified lines around the world. The change came first and most quickly in North America, where, during the 25 years 1935–60 (and especially in the period 1951–60), railroads in the United States completely replaced their steam locomotives.").

application essential." Malloy v. Commonwealth Highland Theaters, Inc., 375 N.W.2d 631, 636 (S.D. 1985) (cleaned up and citation omitted). A plaintiff seeking to invoke res ipsa loquitor in South Dakota must show three things:

> (1) the instrumentality which caused the injury must have been under the full management and control of the defendant or his servants; (2) the accident was such that, according to knowledge and experience, does not happen if those having management or control had not been negligent; and (3) the plaintiff's injury must have resulted from the accident.

Steilen v. Cabela's Wholesale, Inc., 906 N.W.2d 913, 915 (S.D. 2018) (citation omitted). Whether a plaintiff can rely on res ipsa loquitor is initially a question for the court. Cashman v. Van Dyke, 815 N.W.2d 308, 313 (S.D. 2012).

RCPE acknowledges that the train was under its management and control but argues that the Lauings cannot show that the train caused the fire or that the fire was the sort of occurrence that does not normally happen absent negligence by the railroad. RCPE's first argument poses no problem as this Court has already found that a reasonable jury could conclude that RCPE's train caused the fire. The principal issue here, then, is whether the fire is the sort of accident that typically occurs because of railroad negligence. This is a close question, as the Lauings have offered little evidence that trains do not ordinarily cause fires absent negligence by the railroad. Yet the Supreme Court of South Dakota in Hunt held that res ipsa loquitor applied to circumstances similar to those here. Hunt, as discussed above, concerned whether the defendants were liable in negligence for a fire that started in a field where they were operating a windrower, a baler, and a bale hauler. 267 N.W.2d at 567. None of the parties knew the cause of the fire, and none of the defendants' equipment was in the immediate vicinity of the fire when it was first observed. Id. at 567–68. The court nevertheless held that the plaintiffs could rely on res ipsa loquitor; it recognized that the doctrine could apply to fires caused by sparks from locomotive engines and reasoned that

the "combustion-engined tractor and combines" like the defendants were using were more "akin to the spark-emitting locomotives" than to the stove in <u>Le Zotte</u>. <u>Id.</u> at 568. <u>Hunt</u> at least suggests that the Supreme Court of South Dakota views fires started by trains and tractors as more likely to be the result of negligence than fires caused by other instrumentalities.

This Court also cannot ignore that RCPE had the greater capacity to explain how the fire started. In close cases, courts have sometimes found that the defendant's superior access to information "helps resolve doubts in favor of applying res ipsa." Restatement (Third) of Torts: Physical and Emotional Harm § 17 reporters' note, cmt. i (Am. Law Inst. 2010). As noted above, Ogden stated that RCPE should have started investigating immediately after the fire because evidence can become difficult to detect even a few days later. Doc. 48-10 at 8; Doc. 45-11 at 3. He also criticized RCPE's failure to download the locomotive event recorder data, which he believes "would have been valuable evidence to determine potential causes of sparks from the train operation." Doc. 48-10 at 5. Given the <u>Hunt</u> decision and the evidence that RCPE's investigation was deficient, this Court cannot disregard on summary judgment the theory of res ipsa loquitor, although this Court will need to hear the evidence before determining whether to instruct on the <u>Kelsey</u> presumption, res ipsa loquitor, or both.

RCPE argues, however, that the Supreme Court of South Dakota's decision in <u>Cashman</u> shows that res ipsa should not apply. The plaintiff in <u>Cashman</u> sued the defendant after a propane explosion in the defendant's home destroyed the plaintiff's house. 815 N.W.2d at 310. The plaintiff alleged that the defendant was negligent in lighting the pilot light in his furnace the night before the explosion and that this negligence could be inferred under the res ipsa loquitor doctrine. <u>Id.</u> at 313. The Supreme Court of South Dakota disagreed, reasoning that "any number of reasons" might explain the explosion and that the "mere occurrence" of the explosion did not support an

inference of negligence.  Id.  Cashman does not preclude res ipsa from applying here.  Rather, this case is far more like Hunt where the Supreme Court of South Dakota held that res ipsa loquitor applied to a fire allegedly caused by combustion engine harvest equipment.  In sum, South Dakota law and the record in this case when viewed in the Lauings' favor do not support summary judgment on whether RCPE breached its duty to exercise ordinary care in operating and maintaining its train.

### C.  Claim that RCPE Failed to Maintain its Right-of-Way

RCPE, as discussed above, owed the Lauings a duty to keep its right-of-way reasonably free of combustible material.  The Lauings' claim that RCPE breached this duty concerns material in RCPE's right-of-way but not on or immediately adjacent to the roadbed.  See 49 C.F.R. § 213.37.  Courts have defined a railroad's "roadbed" as "the area of soil that supports the ballast, which is the permeable, granular materials such as sand, gravel, crushed rock or slag, chat, cinders, and so on placed around and under the ties to promote track stability."  Mo. Pac. R.R. v. R.R. Comm'n of Tex., 948 F.2d 179, 182 n.2 (5th Cir. 1991); see also Norfolk S. Ry. v. Box, 556 F.3d 571, 572–73 (7th Cir. 2009) (explaining that the roadbed is "compacted earth" on which the ballast and track are placed).  A railroad's right-of-way is not always coextensive with the area on or immediately adjacent to its roadbed: "The area 'immediately adjacent to the roadbed' abuts the roadbed.  Right-of-way property can and often does extend several yards from the roadbed, however.  Consequently, not all right of way property lies 'immediately adjacent to the roadbed' . . . ."  Mo. Pac. R.R., 833 F.2d at 577.  At least one court has determined that the "area immediately adjacent to roadbed extends no further than ten or fifteen feet from it."  Anderson Wis. Cent. Transp. Co., 327 F. Supp. 2d 969, 980 (E.D. Wis. 2004).  RCPE's right-of-way in the area where Heuertz believes the fire started measures about 97 feet from the edge of the ballast rock to the

fence line. Doc. 46 at ¶¶ 4–7. The right-of-way maintains this approximate width throughout the area that burned in the fire. Doc. 46 at ¶ 8.

RCPE makes four main arguments for summary judgment on the Lauings' right-of-way claim. It argues first that the vegetation and railroad ties the Lauings complain of are in the preempted area, that is, on or immediately adjacent to the roadbed. RCPE is partially correct. Some of the old, charred railroad ties shown in one of the photos the Lauings submitted appear to be on or immediately adjacent to RCPE's roadbed. Doc. 45-16 at 1. This is not the only evidence the Lauings have of combustible materials in RCPE's right-of-way, however. At least one other picture the Lauings submitted shows what appear to be charred railroad ties in an area that is arguably not on or immediately adjacent to RCPE's roadbed, Doc. 45-16 at 2, and several pictures show vegetation in areas of RCPE's right-of-way that would not be preempted, Doc. 45-16 at 1–3; Doc. 57-1 at 1–2; Doc. 58-5 at 5; Doc. 64 at ¶ 4. Bernard Lauing testified that RCPE did nothing to control its vegetation, Doc. 45-5 at 2, and John Dustin Lauing saw tall vegetation, broken railroad ties, and spray paint cans in RCPE's right-of-way a few days after the fire, Doc. 45-4 at 2. Heuertz's testimony provides further evidence of combustible materials in RCPE's right of way; again, he described the right-of-way as having "the best fuel there was." Doc. 45-3 at 2. The Lauings have submitted enough evidence to create a genuine dispute of material fact on whether RCPE had combustible materials outside the preempted area but still within its right-of-way.

RCPE's next arguments concern whether its maintenance of the right-of-way could have been a factual cause of the damage to the Lauings' property. RCPE asserts that the condition of its right-of-way was almost identical to that of the Lauings' pasture and that it would therefore be "pure speculation" to claim that its alleged negligent maintenance caused the fire to spread to the pasture. Doc. 55 at 18. According to RCPE, it is not "possible to say that [its] right-of-way was

significant in starting or spreading the fire compared to any other piece of debris or vegetation on" the Lauings' property. Doc. 55 at 19.   These arguments have two major problems.

First, there is a question of fact on whether the Lauings' pasture was in the same condition as RCPE's right-of-way.   RCPE claims that several pictures they submitted show tall, dry grass, fallen timber, and old tires in the Lauings' pasture.   Doc. 55 at 6, 18–19.   But Eugenie Lauing submitted an affidavit explaining that the picture of tall grass depicts RCPE's right-of-way rather than the Lauings' pasture, that the picture showing "fallen timber" is within RCPE's right-of-way, that the fallen timber is a burnt fence post left in the aftermath of the fire, and that the tires shown in the picture were placed there by John Dustin Lauing after the fire to support a drainpipe.   Doc. 64 at ¶¶ 4–6. And again, Heuertz testified that RCPE's right-of-way had "the best fuel there was" and that aerial photos suggested that the right-of-way may have had more abundant fuel than the Lauings' pasture. Doc. 45-3 at 2, 5; Doc. 45-13 at 4.[4]

Second, RCPE would not be entitled to judgment as a matter of law even if the condition of the Lauings' pasture were like that of RCPE's right-of-way.   "Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts." Garrido, 913 N.W.2d at 100 (citation omitted).   "It must be a clear case before a trial judge is justified in taking these proximate cause issues from the jury." Id. (citation omitted).   The Petermans' testimony that the fire broke out near the tracks, Heuertz's testimony that the fire started within twenty to thirty feet of the tracks, and the direction of the wind that day would allow

---

[4]Doc. 45-13 at 4 is the aerial photograph Heuertz was referring to in his testimony. That aerial photograph appears to show a strip of land running parallel to the tracks that is much darker than other areas that were burned. Heuertz testified that there was a fence line where the burned land turned from black to a lighter gray, and that that the lighter gray area was the Lauings' property. Doc. 45-3 at 5. If that is so, the dark black land suggesting more abundant fuel would be on RCPE's right-of-way.

a reasonable jury to find that the fire started on RCPE's right-of-way. Courts have upheld plaintiff verdicts on similar facts in cases where plaintiffs alleged that the railroad's negligent maintenance of its right-of-way caused a fire on their property. Spokane Int'l Ry. Co. v. United States, 72 F.2d 440, 441–43 (9th Cir. 1934) (affirming a verdict for plaintiff where railroad right-of-way contained flammable vegetation and witnesses testified that the fire started near the tracks shortly after the train passed); Gainey v. Rockingham R. Co., 68 S.E.2d 780, 781–82 (N.C. 1952) (upholding plaintiff verdict where railroad right-of-way contained combustible material, witnesses saw a fire start in the right-of-way, and the fire spread through an uncultivated field "overgrown with combustible material" to the plaintiff's house); Kelsey, 45 N.W. at 208 (upholding plaintiff verdict where a witness had seen a fire start near the track and plaintiff introduced evidence that railroad's right-of-way contained tall, dry grass). Under these circumstances, where the facts taken in the light most favorable to the Lauings show that the fire started on RCPE's right-of-way, the presence of combustible materials on the Lauings' property would not rule out RCPE's negligent maintenance of its right-of-way as a factual cause of the Lauings' damages.

RCPE relatedly argues that the Lauings need an expert to show that the fire started in its right-of-way. But the facts do not support the argument that where the fire started is outside the ability of the jury's common knowledge or experience. See Sheard, 965 N.W.2d at 143. Again, the Petermans saw a fire break out near the tracks and Heuertz testified that, based on the fuel pattern and direction of the wind, the fire started within twenty to thirty feet of RCPE's tracks. A jury will be capable of understanding this testimony and its implications without any help from an expert.

RCPE also argues that the Lauings' right-of-way claim fails without expert testimony on the standard of care. Doc. 55 at 20–21. But Ogden provides such testimony. He explains that in

his experience, railroads "have engineering instructions to clear vegetation along the right of way for many reasons, including to reduce the potential of starting a fire." Doc. 48-10 at 9.  He also opines that railroads "should follow industry standards, including the [American Railway Engineering Maintenance-of-Way Association] Vegetation Control Guidelines, so that vegetation along the railroad right of way does not become a fire hazard to track carrying structures or adjacent property." Doc. 48-10 at 9.  According to Ogden, RCPE "failed to reasonably maintain its railroad right of way beyond the area immediately adjacent to its mainline track to reduce the potential of sparks from railroad equipment to ignite a fire." Doc. 48-10 at 9.

### D.  Motion to Exclude Ogden

RCPE argues that Ogden's testimony should be excluded because it violates the Second Amended Rule 16 Scheduling Order.  Doc. 41.  Some history helps to understand RCPE's motion. This Court's initial Rule 16 Scheduling Order made the Lauings' expert disclosures due in October 2019 and RCPE's due the next month.  Doc. 10.  The expert disclosure RCPE filed in November 2019 listed six of its employees and "any RCPE employees identified in discovery" as potential experts having opinions on railroad operations.  Doc. 48-7 at 2; Doc. 18 at 1–2.   These opinions included that the conditions of the track and adjacent area were reasonably safe and met industry standards at the time of the fire; that the train was operated at normal speeds and in conformance with applicable standards with no known defects and with no known circumstances that could lead to a spark from any part of the train; that it would be expected that any condition giving rise to a spark from the train would have been identified through inspections or the investigation of the fire once it was reported to RCPE; and that given RCPE's investigation, the facts will not support any claim that RCPE caused the fire or the damages claimed by the Lauings.  Doc. 48-7 at 2–3.  RCPE failed to specify which of its employees held what opinion.  Doc. 48-7.

28

Pointing to RCPE's deficient expert disclosure, the Lauings moved to amend the deadline for disclosing rebuttal experts.  Docs. 12, 13.  This Court granted the motion and entered a First Amended Rule 16 Scheduling Order giving the Lauings thirty days after deposing the "potential experts" identified by RCPE to disclose their rebuttal expert.  Doc. 18.  The depositions of RCPE's potential experts did not occur within the time set by the First Amended Rule 16 Scheduling Order, so this Court entered a Second Amended setting the following relevant deadlines:

> Defendant shall have until **July 30, 2021**, to disclose which of its employees may be trial witnesses or expert witnesses.  Plaintiffs then have until **September 17, 2021**, to depose those witnesses and Defendant shall make those witnesses available by that date. Plaintiffs must disclose the identity and report of any rebuttal expert within 30 days of completing depositions of Defendant's experts, but by no means shall the Plaintiffs' disclosure be later than **October 18, 2021**.  Defendant then may take the deposition of any rebuttal expert and disclose the identity and report of any surrebuttal expert by **December 3, 2021**.  If a surrebuttal expert is disclosed, this Court may grant leave to depose that expert upon a showing of good cause.

Doc. 33 at 3–4.  On July 30, 2021, RCPE provided a supplemental disclosure listing five of its employees and briefly describing the information they may possess.  Doc. 48-8.  RCPE emailed the Lauings' counsel a few days later saying that the five employees were fact witnesses and that it would not be calling any expert witness.  Doc. 42-1 at 1.  The Lauings deposed the five RCPE employees on September 13 and 14, 2021.  Doc. 48 at ¶ 2.  They disclosed Ogden's expert report to RCPE on October 13, 2021.  Doc. 48 at ¶ 3.

RCPE argues that the Second Amended Rule 16 Scheduling Order did not allow the Lauings to disclose a rebuttal expert unless RCPE disclosed an expert first.  Since RCPE designated its employees as fact witness, it now claims that the Ogden's disclosure was untimely and violates the Scheduling Order.  The Lauings disagree, arguing that the opinions offered by RCPE's employees during their depositions constitute expert testimony under the Federal Rules

of Evidence and that these opinions are the same as those RCPE identified in its November 2019 expert disclosures.

Opinions based on "scientific, technical, or other specialized knowledge within the scope of Rule 702" are not admissible as lay testimony. Fed. R. Evid. 701(c). Courts look to the substance of the opinion, rather than the label assigned to the witness, to determine whether the witness is offering an expert or lay opinion. United States v. STABL, Inc., 800 F.3d 476, 486–87 (8th Cir. 2015). The Lauings claim that the opinions of RCPE's employees fall within Rule 702 because they are based on the employees' specialized knowledge, training, and experience. This argument has support; as one judge explained, the "specialized nature of railroading and the unique skills and knowledge required for effective railroad operations have often led courts to classify railroad employees as experts on the basis of their specialized knowledge." Nat'l R. R. Passenger Corp v. Ry. Express, LLC, 286 F.R.D. 211, 214 (D. Md. 2010). At the same time, drawing the line between an expert and lay opinion can be difficult, particularly when the witness's testimony is based on experience in a certain industry. 29 Victor J. Gold, Federal Practice and Procedure Evid. § 6253 (2d ed. Apr. 2022 update) ("[S]everal courts have held that, in cases involving opinions based on various types of experience in a given industry or on a specific subject, the trial court has discretion to treat the opinion as that of a lay or expert witness."); see also Burlington N. R.R. v. Nebraska, 802 F.2d 994, 1004–05 (8th Cir. 1986) (ruling that it was an abuse of discretion not to consider lay testimony by four railroad executives who testified, "based on knowledge derived from supervising railroad operations, years of experience in the industry, and review of employee accident reports," that "trains with cabooses were no safer than cabooseless trains"). Because excluding Ogden's testimony would be inappropriate even if RCPE's employees were

merely lay witnesses, this Court need not decide whether their testimony falls within Rule 701 or Rule 702.

The Federal Rules of Civil Procedure authorize the exclusion of belatedly disclosed expert testimony unless the late disclosure was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); Firefighter's Inst. for Racial Equality ex rel. Anderson v. City of St. Louis, 220 F.3d 898, 902 (8th Cir. 2000). "[T]he exclusion of evidence is a harsh penalty and should be used sparingly . . . ." Wegener v. Johnson, 527 F.3d 687, 692 (8th Cir. 2008) (citation omitted).  Courts consider four factors when deciding whether belatedly disclosed expert testimony should be excluded: "(1) the importance of the excluded expert testimony; (2) the party's explanation for failure to disclose; (3) the potential prejudice created by permitting use of the expert testimony at trial or on a pending motion; and (4) the ability to cure any prejudice by granting a continuance." Sancom, Inc. v. Qwest Commc'ns Corp., 683 F. Supp. 2d 1043, 1063 (D.S.D. 2010).

All four of these factors favor the Lauings.  First, Ogden's testimony is important; the Lauings rely on him to testify about the standard of care for their right-of-way claim and to rebut RCPE's argument that its investigation shows that its train could not have caused the fire.  Second, the Lauings have a good reason for not disclosing Ogden earlier.  RCPE's November 2019 expert disclosure identified six employees as potential experts but was otherwise very general.  This Court therefore extended the deadline for disclosing a rebuttal expert until thirty days after the Lauings deposed the "potential experts" identified by RCPE.  Doc. 18.  This Court entered a Second Amended Scheduling Order, but that Order also gave the Lauings until thirty days after deposing RCPE's experts to disclose their rebuttal expert.  Doc. 33.  The Lauings therefore had no reason to think that they needed to disclose their rebuttal expert before deposing RCPE's potential defense experts.  Any argument to the contrary is really a backdoor attack on this Court initial decision to

31

allow the Lauings to disclose a rebuttal expert. Third, allowing the Lauings to use Ogden's testimony would not unfairly prejudice RCPE. After all, RCPE deposed Ogden and had over a month-and-half after his disclosure to designate a surrebuttal expert. Fourth, a continuance is not necessary because there is no prejudice to RCPE and RCPE had an opportunity to depose Ogden and disclose a surrebuttal expert. In sum, any untimeliness in disclosing Ogden is substantially justified and harmless. This is not one of the rare cases where the "harsh penalty" of excluding a witness is appropriate. Wegener, 527 F.3d at 692.

IV.    **Conclusion**

For the reasons stated above, it is

ORDERED that RCPE's Motion for Summary Judgment, Doc. 36, is denied. It is further

ORDERED that RCPE's Motion to Exclude Plaintiffs' Expert Brandon Ogden, Doc. 40, is denied.

DATED this _8th_ day of July, 2022.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

32